# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| GASP, CLEAN AIR COUNCIL, HOOSIER ENVIRONMENTAL COUNCIL, JUST TRANSITION NORTHWEST INDIANA, PANIC, PENNFUTURE, and SIERRA CLUB,<br><br>*Petitioners*,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, Administrator, U.S. Environmental Protection Agency,<br><br>*Respondents*. | Case No. 25-1166 |

## PETITION FOR REVIEW

Pursuant to Clean Air Act § 307(b)(1), 42 U.S.C. § 7607(b)(1), Rule 15 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rule 15, GASP, Clean Air Council, Hoosier Environmental Council, Just Transition Northwest Indiana, PANIC, PennFuture, and Sierra Club hereby petition this Court for review of the final action taken by Respondents U.S. Environmental Protection Agency and Administrator Lee Zeldin in the Federal Register notice published at 90 Fed. Reg. 29,997 (July 8, 2025) and titled "National Emission Standards for Hazardous Air Pollutants: Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology

1

Review" (Attachment 1).

DATED: August 6, 2025 /s/ *Tosh Sagar*
Tosh Sagar
Adrienne Y. Lee
Kevin Breiner
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 667-4500
tsagar@earthjustice.org
alee@earthjustice.org
kbreiner@earthjustice.org

*Counsel for GASP, Hoosier Environmental Council, Just Transition Northwest Indiana, PennFuture, and Sierra Club*

/s/ *David Bookbinder*
David Bookbinder
Director of Law and Policy
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, D.C. 20006
(202) 469-3151
dbookbinder@environmentalintegrity.org

Haley Lewis
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, D.C. 20006
(202) 263-4449
hlewis@environmentalintegrity.org

*Counsel for Clean Air Council and PANIC*

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| GASP, CLEAN AIR COUNCIL, HOOSIER ENVIRONMENTAL COUNCIL, JUST TRANSITION NORTHWEST INDIANA, PANIC, PENNFUTURE, and SIERRA CLUB,<br><br>*Petitioners*,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, Administrator, U.S. Environmental Protection Agency,<br><br>*Respondents*. | Case No. 25-1166 |

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, GASP, Clean Air Council, Hoosier Environmental Council, Just Transition Northwest Indiana, PANIC, PennFuture, and Sierra Club make the following disclosures:

### GASP

<u>Non-Governmental Corporate Party to this Action</u>: GASP (Greater-Birmingham Alliance to Stop Pollution).

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

Party's General Nature and Purpose: GASP is an Alabama-based nonprofit corporation organized and existing under the laws of Alabama. GASP advocates for the reduction of air pollution, advancement of environmental justice, and promotion of climate solutions.

## Clean Air Council

Non-Governmental Corporate Party to this Action: Clean Air Council ("CAC").

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: CAC is a nonprofit corporation organized and existing under the laws of the Commonwealth of Pennsylvania. As an environmental health advocacy organization, CAC is focused on protecting people's health from the harmful impacts of pollution.

## Hoosier Environmental Council

Non-Governmental Corporate Party to this Action: Hoosier Environmental Council ("HEC").

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: HEC is a nonprofit corporation organized and existing under the laws of the State of Indiana. HEC is Indiana's largest environmental public policy organization, working to improve people's health, the

economy, and the environment for forty years, through education, technical assistance, and advocacy.

**Just Transition Northwest Indiana**

Non-Governmental Corporate Party to this Action: Just Transition Northwest Indiana ("JTNWI").

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: JTNWI is a nonprofit corporation organized and existing under the laws of the State of Indiana. JTNWI educates and organizes Northwest Indiana communities and workers to support a just transition to a regenerative economy that protects the environment, climate, and future generations.

**People Against Neighborhood Industrial Contamination**

Non-Governmental Corporate Party to this Action: People Against Neighborhood Industrial Contamination ("PANIC") Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: PANIC is an organization organized and existing under the laws of the State of Alabama. PANIC is a not for profit organization that encourages community members to speak out about their concerns with local air pollution, through attending public hearings, writing letters,

calling local air agencies, and other activities.

## PennFuture

<u>Non-Governmental Corporate Party to this Action</u>: Citizens for Pennsylvania's Future ("PennFuture").

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: PennFuture is a nonprofit corporation organized and existing under the laws of the Commonwealth of Pennsylvania. PennFuture is dedicated to the transition to a clean energy economy and to the protection of air, water, and land.

## Sierra Club

<u>Non-Governmental Corporate Party to this Action</u>: Sierra Club.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: Sierra Club is a nonprofit corporation organized and existing under the laws of the State of California, dedicated to the protection and enjoyment of the environment.

DATED: August 6, 2025

/s/ *Tosh Sagar*
Tosh Sagar
Adrienne Y. Lee
Kevin Breiner
Earthjustice
1001 G Street, NW, Suite 1000

Washington, DC 20001
(202) 667-4500
tsagar@earthjustice.org
alee@earthjustice.org
kbreiner@earthjutice.org

*Counsel for GASP, Hoosier Environmental Council, Just Transition Northwest Indiana, PennFuture, and Sierra Club*

/s/ *David Bookbinder*
David Bookbinder
Director of Law and Policy
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, D.C. 20006
(202) 469-3151
dbookbinder@environmentalintegrity.org

Haley Lewis
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, D.C. 20006
(202) 263-4449
hlewis@environmentalintegrity.org

*Counsel for Clean Air Council and PANIC*

# CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing **Petition for Review** and **Rule 26.1 Disclosure Statement** to be served on Respondents by sending a copy via First-Class Mail to each of the following addresses on this 6th day of August, 2025.

    Lee Zeldin
    EPA Headquarters 1101A
    United States Environmental Protection Agency
    William Jefferson Clinton Federal Building
    1200 Pennsylvania Avenue, N.W.
    Washington, D.C. 20460

    Pamela J. Bondi
    Attorney General
    U.S. Department of Justice
    950 Pennsylvania Avenue, N.W.
    Washington, D.C. 20530

    Correspondence Control Unit Office of
    General Counsel (2311)
    United States Environmental Protection Agency
    William Jefferson Clinton Federal Building
    1200 Pennsylvania Avenue, N.W.
    Washington, D.C. 20460

                                */s/ Tosh Sagar*
                                Tosh Sagar

# ATTACHMENT 1



Second Implementation Period" after the entry for "Regional Haze Five-Year Progress Report".

The additions read as follows:

§ 52.1870 Identification of plan.

* * * * *

(d) * * *

### EPA-APPROVED OHIO SOURCE-SPECIFIC PROVISIONS

| Name of source | Number | Ohio effective date | EPA approval date | Comments |
|---|---|---|---|---|
| * * | * | * | * | * |
| Cardinal Power Plant | DFFO | 7/26/2024 | 7/8/2025, 90 FR [insert **Federal Register** page where the document begins]. | Regional haze emission limit. |
| * * | * | * | * | * |
| General James M. Gavin Power Plant | DFFO | 7/26/2024 | 7/8/2025, 90 FR [insert **Federal Register** page where the document begins]. | Regional haze emission limit. |
| * * | * | * | * | * |
| Ohio Valley Electric Corp.—Kyger Creek Station. | DFFO | 7/26/2024 | 7/8/2025, 90 FR [insert **Federal Register** page where the document begins]. | Regional haze emission limits. |
| * * | * | * | * | * |

(e) * * *

### EPA-APPROVED OHIO NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Title | Applicable geographic or nonattainment area | State date | EPA approval | Comments |
|---|---|---|---|---|
| * * | * | * | * | * |
| **Visibility Protection** | | | | |
| * * | * | * | * | * |
| Regional Haze Plan for the Second Implementation Period. | Statewide | 7/30/2021, 8/6/2024, and 6/16/2025. | 7/8/2025, 90 FR [insert **Federal Register** page where the document begins]. | Full Approval. |

* * * * *

[FR Doc. 2025–12526 Filed 7–7–25; 8:45 am]
BILLING CODE 6560–50–P

---

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 63**

[EPA–HQ–OAR–2002–0085, EPA–HQ–OAR–2003–0051; FRL–8471.1–03–OAR]

### National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The U.S. Environmental Protection Agency (EPA) is taking interim final action on revisions to the National Emission Standards for Hazardous Air Pollutants (NESHAP) for the Coke Oven Batteries (COB) source category and the Coke Ovens: Pushing, Quenching, and Battery Stacks (PQBS) source category by revising certain compliance deadlines for standards finalized in 2024. Specifically, the EPA is amending the compliance deadlines for certain 2024 revisions to the COB and PQBS NESHAPs from July 7, 2025 and January 6, 2026, to July 5, 2027. The EPA seeks comment on this final action and will respond to comments received and revise this final action as appropriate.

**DATES:** This interim final rule is effective on July 8, 2025. Comments on this rule must be received on or before August 7, 2025.

**ADDRESSES:** You may send comments, identified by Docket ID Nos. EPA–HQ–OAR–2002–0085 (Coke Ovens: Pushing, Quenching, and Battery Stacks source category) and EPA–HQ–OAR–2003–0051 (Coke Oven Batteries source category) by any of the following methods:

• *Federal eRulemaking Portal:* https://www.regulations.gov (our preferred method). Follow the online instructions for submitting comments.

• *Email: a-and-r-docket@epa.gov.* Include Docket ID Nos. EPA–HQ–OAR–2002–0085 or EPA–HQ–OAR–2003–0051 in the subject line of the message.

• *Fax:* (202) 566–9744. Attention Docket ID Nos. EPA–HQ–OAR–2002–0085 or EPA–HQ–OAR–2003–0051.

• *Mail:* U.S. Environmental Protection Agency, EPA Docket Center, Docket ID Nos. EPA–HQ–OAR–2002–0085 or EPA–HQ–OAR–2003–0051, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.

• *Hand/Courier Delivery:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operation are 8:30 a.m. to 4:30 p.m., Monday through Friday (except Federal holidays).

Comments received may be posted without change to *https://www.regulations.gov,* including any personal information provided. For detailed instructions on sending comments, see the "Public Participation" heading of the General Information section of this preamble.

**FOR FURTHER INFORMATION CONTACT:** U.S. EPA, Attn: Jonathan Witt, Mail Drop: D243–04, 109 T.W. Alexander Drive, P.O. Box 12055, Research Triangle Park, North Carolina 27711; telephone number: (919) 541–5645; email address: *witt.jon@epa.gov.*

*Preamble acronyms and abbreviations.* Throughout this document the use of "we," "us," or "our" is intended to refer to the EPA. We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

AG   acid gases
APA   Administrative Procedure Act
B/W   bypass/waste heat
CAA   Clean Air Act
CBI   Confidential Business Information
CFR   Code of Federal Regulations
COB   coke oven batteries
COETF   Coke Oven Environmental Task Force
CRA   Congressional Review Act
D/F   dioxins and furans
EIA   economic impact analysis
EPA   Environmental Protection Agency
FR   Federal Register
HAP   hazardous air pollutant(s)
HBEL   health-based emission limit
HCl   hydrochloric acid
HCN   hydrogen cyanide
HF   hydrogen fluoride
HNR   heat and nonrecovery (*i.e.,* no chemical recovery), or nonrecovery with no heat recovery
HRSG   heat recovery steam generator
MACT   maximum achievable control technology
NESHAP   national emission standards for hazardous air pollutants
NTTAA   National Technology Transfer and Advancement Act
OAQPS   Office of Air Quality Planning and Standards
OMB   Office of Management and Budget
PAH   polycyclic aromatic hydrocarbons
PM   particulate matter
PRA   Paperwork Reduction Act
PQBS   pushing, quenching, and battery stacks
RFA   Regulatory Flexibility Act
RtC   response to comments
RTR   risk and technology review
tpy   tons per year
UMRA   Unfunded Mandates Reform Act
VOHAP   volatile organic HAP

*Organization of this preamble.* The information in this preamble is organized as follows:
I. General Information
  A. Public Participation
  B. Potentially Affected Entities
  C. Statutory Authority
  D. Judicial Review and Administrative Review
II. Regulatory Revisions
  A. COB and PQBS NESHAPs Background and Summary
  B. Petitions for Reconsideration
  C. Compliance Challenges
  D. Specific Regulatory Revisions
III. Rulemaking Procedures
IV. Request for Comment
V. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
  B. Executive Order 14192: Unleashing Prosperity Through Deregulation
  C. Paperwork Reduction Act (PRA)
  D. Regulatory Flexibility Act (RFA)
  E. Unfunded Mandates Reform Act of 1995 (UMRA)
  F. Executive Order 13132: Federalism
  G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  J. National Technology Transfer and Advancement Act (NTTAA)
  K. Congressional Review Act (CRA)

**SUPPLEMENTARY INFORMATION:**

# I. General Information

## A. Public Participation

Submit your written comments, identified by Docket ID Nos. EPA–HQ–OAR–2002–0085 or EPA–HQ–OAR–2003–0051, at *https://www.regulations.gov* (our preferred method), or by the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to the EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. This type of information should be submitted as discussed in the *Submitting CBI* section of this preamble. Multimedia submissions (audio, video, *etc.*) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system). Please visit *https://www.epa.gov/dockets/commenting-epa-dockets* for additional submission methods; the full EPA public comment policy; information about CBI or multimedia submissions; and general guidance on making effective comments.

*Submitting CBI.* Do not submit information containing CBI to the EPA through *https://www.regulations.gov.* Clearly mark the part or all of the information that you claim to be CBI. For CBI information on any digital storage media that you mail to the EPA, note the docket ID, mark the outside of the digital storage media as CBI, and identify electronically within the digital storage media the specific information that is claimed as CBI. In addition to one complete version of the comments that includes information claimed as CBI, you must submit a copy of the comments that does not contain the information claimed as CBI directly to the public docket through the procedures outlined in the *Public Participation* section of this preamble. If you submit any digital storage media that does not contain CBI, mark the outside of the digital storage media clearly that it does not contain CBI and note the docket ID. Information not marked as CBI will be included in the public docket and the EPA's electronic public docket without prior notice. Information marked as CBI will not be disclosed except in accordance with procedures set forth in 40 Code of Federal Regulations (CFR) part 2.

Our preferred method to receive CBI is for it to be transmitted electronically using email attachments, File Transfer Protocol, or other online file sharing services (*e.g.,* Dropbox, OneDrive, Google Drive). Electronic submissions must be transmitted directly to the Office of Air Quality Planning and Standards (OAQPS) CBI Office at the email address *oaqpscbi@epa.gov* and, as described above, should include clear CBI markings and note the docket ID. If assistance is needed with submitting large electronic files that exceed the file size limit for email attachments, and if you do not have your own file sharing service, please email *oaqpscbi@epa.gov*

to request a file transfer link. If sending CBI information through the U.S. Postal Service, please send it to the following address: U.S. EPA, Attn: OAQPS Document Control Officer, Mail Drop: C404–02, 109 T.W. Alexander Drive, P.O. Box 12055, Research Triangle Park, North Carolina 27711, Attention Docket ID Nos. EPA–HQ–OAR–2002–0085 or EPA–HQ–OAR–2003–0051. The mailed CBI material should be double wrapped and clearly marked. Any CBI markings should not show through the outer envelope.

*B. Potentially Affected Entities*

As defined in the *Initial List of Categories of Sources Under Section 112(c)(1) of the Clean Air Act Amendments of 1990* (see 57 FR 31576, July 16, 1992) and *Documentation for Developing the Initial Source Category List, Final Report* (see EPA–450/3–91–030, July 1992), the Coke Oven Batteries (COB) source category includes emissions from the batteries themselves. The Pushing, Quenching, and Battery Stacks (PQBS) source category includes emissions from pushing and quenching operations, and from battery stacks at a coke oven facility. A coke oven facility is defined as a facility engaged in the manufacturing of metallurgical coke by the destructive distillation of coal. The 2022 North American Industry Classification System (NAICS) code for the COB source category (40 CFR part 63, subpart L) is 324199 for "All Other Petroleum and Coal Products Manufacturing," and for the PQBS source category (40 CFR part 63, subpart CCCCC) is 331110 for "Iron and Steel Mills and Ferroalloy Manufacturing." The information provided in this section is not intended to be exhaustive but rather provides a guide for readers regarding the entities that this action is likely to affect. The revised compliance dates are directly applicable to the affected sources. Federal, State, local, and Tribal government entities will not be affected by this interim final action. Based on the information we have, there are 11 operating coke manufacturing facilities subject to these national emission standards for hazardous air pollutants (NESHAP). If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

*C. Statutory Authority*

Statutory authority to issue the amendments finalized in this action is provided by the same Clean Air Act (CAA) provisions that provided authority to issue the regulations that set the compliance deadlines being amended in this action: CAA section 112, as amended (42 U.S.C. 7412). Statutory authority for the rulemaking procedures followed in this action is provided by Administrative Procedure Act (APA) section 553(b)(B), 5 U.S.C. 553(b)(B) (good cause exception to notice-and-comment rulemaking).

*D. Judicial Review and Administrative Review*

Under CAA section 307(b)(1), judicial review of this final action is available only by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit by September 8, 2025. Under CAA section 307(b)(2), the requirements established by this final rule may not be challenged separately in any civil or criminal proceedings brought by the EPA to enforce the requirements.

## II. Regulatory Revisions

*A. COB and PQBS NESHAPs Background and Summary*

The COB NESHAP (40 CFR part 63, subpart L), promulgated on October 27, 1993, established standards for emissions from doors, lids, and offtakes at heat and/or nonrecovery (HNR) facilities and any new coke production process with by-product chemical recovery facilities. The PQBS NESHAP (40 CFR part 63, subpart CCCCC), promulgated on April 14, 2003, established emissions standards for pushing coke out of ovens, quenching hot coke, and battery stacks of oven combustion. The risk and technology review (RTR) for the 1993 COB NESHAP was completed on April 5, 2005. In the most recent action, finalized July 5, 2024, the EPA completed a periodic technology review for the COB NESHAP, and an RTR for the PQBS NESHAP, that resulted in amendments to these rules (89 FR 55684) (the "Coke Ovens rule"), which included: (1) maximum achievable control technology (MACT) standards to address previously unregulated emissions of hazardous air pollutants (HAP) from the PQBS source category pursuant to our interpretation of *Louisiana Environmental Action Network* v. *EPA,* 955 F.3d 1088 (D.C. Cir. 2020) ("*LEAN*"); and (2) revised emissions standards based on new information regarding developments in practices, processes, and control technologies pursuant to CAA section 112(d)(6).

Relevant to this action, the Coke Ovens rule finalized the following standards in the COB source category pursuant to CAA section 112(d)(6): (1) fenceline monitoring requirements; (2) revised leak standards for doors, lids, and offtakes; and (3) revised pressure monitoring requirements for oven doors at HNR facilities. In addition, the Coke Ovens rule finalized the following standards to address previously unregulated HAP in the PQBS source category: (1) four new emission standards based on MACT for pushing operations: acid gases (AG),[1] hydrogen cyanide (HCN), mercury (Hg), and polycyclic aromatic hydrocarbons (PAH) (which is also a surrogate for dioxins and furans (D/F), formaldehyde, and volatile organic HAP (VOHAP)); (2) four new emission standards based on MACT for battery stacks: AG, HCN, Hg, and particulate matter (PM) (as a surrogate for non-Hg HAP metals); (3) four new emission standards based on MACT for HNR heat recovery steam generator (HRSG) main stacks: AG, Hg, PAH (which is also a surrogate for formaldehyde), and PM (as a surrogate for non-Hg HAP metals); (4) five new emission standards based on MACT for HNR bypass/waste heat (B/W) stacks: AG, formaldehyde (which is also a surrogate for VOHAP), Hg, PAH, and PM (as a surrogate for non-Hg HAP metals); and (5) a new MACT standard, in the form of a good combustion practices work practice standard, for PAH, D/F, and VOHAP emitted from battery stacks. Finally, pursuant to CAA section 112(d)(6), the Coke Ovens rule finalized opacity limits on HNR B/W stacks for the PQBS source category.

*B. Petitions for Reconsideration*

Following the issuance of the Coke Ovens rule, the American Coke and Coal Chemicals Institute (and the Coke Oven Environmental Task Force (COETF) that it manages), SunCoke Energy, and the United States Steel Corporation submitted petitions for reconsideration on September 3, 2024, detailing alleged errors, requesting corrections, and expressing concerns regarding the technical feasibility of certain new requirements and the timing of compliance.

On March 20, 2025, the EPA responded to the petitions for reconsideration, granting discretionary reconsideration on the following issues (the applicable NESHAP is listed in parentheses):

- Fenceline monitoring (COB NESHAP)
- MACT standards (PQBS NESHAP)
- Revised leak limits for doors, lids, and offtakes (COB NESHAP)

---

[1] Acid gases include hydrochloric acid (HCl) and hydrogen fluoride (HF).

- Achieving zero leaks from HNR oven doors (COB NESHAP)[2]
- Opacity limits on HNR B/W stacks (PQBS NESHAP)

1. Fenceline Monitoring

For fenceline monitoring, the EPA has identified two issues that warrant reconsideration:
• First, the COETF commented that the EPA should be using the actual fenceline boundary when setting the action level (instead of using the polar grid approach). In the final rule, according to the commenter, the EPA used receptors at the fenceline boundary to set the action level but did not include the receptor with the highest modeled benzene concentration. The EPA agrees that this had the potential to yield a lower action level than necessary and is thus granting reconsideration to reevaluate.
• Second, in the final rule, the EPA required that facilities must employ "appropriate real-time sampling techniques" (1) in their site-specific monitoring plans if they plan to account for proximate onsite sources of benzene emissions, and (2) to locate the cause of an action level exceedance if a root cause determination has not been made within 30 days. In their petition for reconsideration, the COETF argued that real-time monitors are not widely used in the cokemaking industry. They also argued that the Coke Ovens rule did not address multiple issues with real-time monitors, including the technical feasibility of locating and installing real-time monitors, the difficulty of using real-time benzene monitor data and the two-week average benzene monitor data at the fenceline to determine an appropriate delta c (the lowest concentration subtracted from the highest concentration), the complexity of using these monitors at coke facilities, and the cost of installing and operating monitors. The EPA agrees that evaluating these issues is necessary to assess whether the standards as finalized are feasible for sources to comply with and is thus granting reconsideration on appropriate real-time sampling techniques.

2. PQBS MACT Standards

For the MACT standards in the PQBS NESHAP, the EPA has identified three issues that warrant reconsideration.

---
[2] Specifically, the EPA is reconsidering the requirement to both (1) achieve zero percent leaking oven doors as determined by EPA Method 303A; and (2) conduct pressure monitoring to ensure that the ovens are operated under a negative pressure. In the letter granting reconsideration, the EPA incorrectly labeled this issue as pertaining to the PQBS NESHAP, when it actually applies to the COB NESHAP.

First, petitioners indicated that there were several issues related to limited data. After the comment period, which closed on October 2, 2023, the COETF submitted the following documents to the EPA that provided additional information on the limited data issue:
• December 29, 2023, white paper from the COETF titled "Coke Ovens RTR Proposed Rule: White Paper on Proposed Standards" (hereafter referred to as the "Variability White Paper");[3]
• April 2, 2024, white paper from Trinity Consultants (at the request of the COETF) titled "Intra-Mine Variability Factor for Mercury in Metallurgical Coals" (hereafter referred to as the "Trinity IMV Hg White Paper");[4] and
• May 3, 2024, white paper from Trinity Consultants (at the request of the COETF) titled "Upper Prediction Limit Calculations with Intra-Mine Variability Factor" (hereafter referred to as the "Trinity UPL IMV White Paper").[5]

These white papers discussed the concept of intra-mine variability factors, which would account for the natural variability of mercury, fluorine, and chlorine within metallurgical coal when determining the MACT standards. The papers indicate that the amount of mercury within the coal has a direct impact on the amount of mercury emissions, and the amounts of fluorine and chlorine within the coal have direct impacts on the amounts of HF and HCl emissions, respectively. The COETF noted that similar "intra-quarry variability" factors had been applied by the EPA in other manufacturing industries (e.g., Portland cement, lime, and brick and structural clay products).

Second, in a March 22, 2024, email, the COETF requested that: (1) HCl be used as a surrogate for HF; and (2) a health-based emission limit (HBEL) be established for HCl (in lieu of a harder-to-meet MACT floor limit). The COETF asserted that HCl is a more appropriate surrogate for of the same reasons articulated in the final rule for the Integrated Iron and Steel source category, where the EPA stated that the "numerical standard for HCl being finalized in this rule shall act as a work practice (or surrogate) for HF, as control of HCl will also control HF" (89 FR 23310, October 9, 2024). The COETF also asserted that an HBEL is the most appropriate standard for HCl for the same reasons articulated in the EPA's supplemental notice of proposed

---
[3] See Docket ID Nos. EPA–HQ–OAR–2002–0085–1516 and EPA–HQ–OAR–2003–0051–1884.
[4] See Docket ID Nos. EPA–HQ–OAR–2002–0085–1517 and EPA–HQ–OAR–2003–0051–1885.
[5] See Docket ID Nos. EPA–HQ–OAR–2002–0085–1518 and EPA–HQ–OAR–2003–0051–1886.

rulemaking for the Lime Manufacturing source category, where the EPA proposed a mass-based HBEL for HCl in lieu of a technology-based limit (89 FR 9088, February 9, 2024). The EPA is reconsidering because the use of HCl as a surrogate for HF, as well as an HBEL for HCl, is potentially more appropriate than the AG MACT standards that were promulgated in the Coke Ovens rule.

Finally, the COETF stated in its petition for reconsideration that the EPA used a normal distribution for calculating the HCN limit for pushing emissions in the Coke Ovens rule when a lognormal distribution should have been used and that the use of the lognormal distribution would have raised the limit by a factor of three. Because of the potential magnitude of difference, the EPA is reconsidering the rule to reevaluate its calculations.

3. Leak Limits for Doors, Lids, and Offtakes

For leak limits for doors, lids, and offtakes, the EPA has identified two issues that warrant reconsideration:
• In their petition for reconsideration, the COETF pointed to text of the Coke Ovens rule where the EPA stated that it can "infer" from compliance data showing fewer leaking doors, lids, and offtakes that there are "improved work practices for observing leaks during operations, and more quickly and efficiently sealing and adjusting doors, or other practices related to door leaks." The COETF asserts that: (1) there have been no changes or identified improvements in the leak control practices used in the industry; (2) the same leak control practices used by facilities today were in use and considered during development of the original MACT standards; and (3) there are no different or specialized work practices conducted at the one "large" coke plant that are not practiced at other coke plants. The EPA is reconsidering this aspect of the rule to evaluate these claims.
• The COETF also argued that the EPA improperly selected a 3 million tons per year (tpy) production capacity threshold to create a subcategory of one facility because there is only one such coke facility that exceeds 3 million tpy coke production, and no different or improved work practices exist that are unique to this facility. The COETF informed the EPA that the one "large" facility employs the same leak control practices used by the rest of the industry and commented that higher coke production capacity does not leads to lower leak rates. The EPA agrees that, if true, this information would impact the

appropriate threshold and is therefore reconsidering this portion.

4. Requirements for Oven Doors at HNR Facilities

For the requirements for oven doors at HNR facilities, the EPA has identified one issue that warrants reconsideration. In its petition for reconsideration, SunCoke argued that the Coke Ovens rule added redundant pressure monitoring requirements using EPA Method 303A that are unnecessary. Specifically, they raised the following concerns:
• Redundant monitoring using EPA Method 303A is not supported by the EPA's technology review;
• EPA Method 303A performance testing is unnecessary when operating coke ovens under negative pressure; and
• Redundant monitoring will not result in earlier detection of door leaks.

*C. Compliance Challenges*

The items identified for reconsideration in the response letter have compliance dates of July 7, 2025, or January 6, 2026, under the Coke Ovens rule. After further consideration of all the reconsideration issues, the parties' petitions for reconsideration, and further discussions with stakeholders, the EPA has determined that compliance challenges necessitate changes to the compliance dates for fenceline monitoring; the PQBS MACT standards; the leak limits for doors, lids, and offtakes; and the requirements for oven doors at HNR facilities to July 5, 2027. Although the EPA is reconsidering the opacity limits for HNR B/W stacks, we determined that the compliance date for this standard is feasible, so we are not revising the date in this action.

In March 2025, all companies operating cokemaking facilities in the U.S. requested extensions for the compliance dates in the final rule under CAA section 112(i)(3)(B). The EPA's Office of Enforcement and Compliance Assurance sent letters to three companies stating that they did not provide enough information to determine whether the compliance date extensions were warranted, Those letters have since been withdrawn. The specific compliance challenges posed by each of the requirements where we are revising the compliance dates are discussed as follows:

1. Fenceline Monitoring

Fenceline monitoring is used to determine the concentration of ground-level pollutants at the facility boundary. One potential source of those pollutants is leaks from doors, lids, and offtakes at COBs. The limits for these leaks were revised in the Coke Ovens rule with a compliance date of July 7, 2025. In order to ensure compliance with the revised leak limits, facilities generally need to test current controls, evaluate which additional controls or reconfigurations are needed, secure permits, procure parts and services, install additional equipment, and perform testing on the new controls. Some of these processes can overlap, but some can only be performed sequentially, which the EPA agrees impacts sources' ability to comply within the current timeframe. Therefore, the EPA is revising the deadline to July 5, 2027, to allow sufficient time for the industry to comply given the unanticipated compliance problems and additional information noted earlier in this preamble.

2. PQBS MACT Standards

Petitioners indicated that 18 months is not enough time within which to comply with the PQBS MACT standards by the January 6, 2026, compliance date in the Coke Ovens rule. In their comments on the proposed rulemaking, the COETF requested a 3-year compliance schedule to "allow affected facilities the time needed to evaluate the need for additional emission controls and to assess feasibility and technical risks, design, engineer, procure and install the new equipment before compliance is required." [6] During a post-comment period meeting on February 6, 2024,[7] the EPA requested that the COETF provide additional information supporting the need for a 3-year compliance schedule. The COETF submitted this information to the EPA on February 9, 2024 (hereafter referred to as the "Compliance Concerns White Paper").[8] The Compliance Concerns White Paper provided examples for several units where the MACT emissions standards would likely be exceeded, and it also asserted the following concerns:

• Controlling multiple pollutants and retrofitting controls into existing operations add complexity and time due to interactions in the requirements for control, including pollutant interactions, flow rates, chemistry, and temperatures;

---

[6] The COETF also stated that retrofitting new equipment into a facility with already limited space available for the new equipment can require complex mechanical designs that are especially time-consuming.

[7] As previously mentioned, the public comment period for this rule closed on October 2, 2023.

[8] See Docket ID Nos. EPA–HQ–OAR–2002–0085–1514 and EPA–HQ–OAR–2003–0051–1882.

• Control technologies for HCN are not technically feasible in the industry; and
• Extensive engineering and physical modifications will be needed for add-on controls, and additional controls would require permitting from the local permitting agency, with permitting taking 6 to 12 months after engineering is completed.

In the Coke Ovens rule, the EPA stated that ". . . based on the data submitted to the EPA by the industry, all facilities should be able to meet the MACT floor limits developed for the previously unregulated HAP and unregulated sources of HAP without the installation of additional controls" (89 FR 55710, July 5, 2024). However, the information provided after the close of comments in the Compliance Concerns White Paper and in SunCoke's petition for reconsideration—which stated that it has exceeded the limits and provided additional data and information—demonstrates that additional controls may indeed be necessary and/or that operational changes may be required if a facility exceeds the standards that have not been evaluated and that bear on sources' ability comply with the 18-month schedule in the Coke Ovens rule. This demonstrates that the original timelines in the Coke Oven rule may be infeasible for sources to adhere to, which provides compelling reason for the EPA to revise the deadlines.

Below is a list of the steps petitioners indicated are required to implement additional controls and the amount of time they assert is required for each step: [9]
• Step 1: Test current controls—at least 1 year to complete.
• Step 2: Determine what additional controls will be needed, along with any facility re-designs, monitoring equipment, and software upgrades—at least 1 year to complete.
• Step 3: Secure vendors, as needed, for additional controls, facility re-designs, monitoring equipment, and software upgrades—at least 1 year to complete.
• Step 4: Secure a new permit—at least 6 months to complete. For Title V sources, construction and testing of new air pollution control equipment cannot start until a permit is issued.
• Step 5: Order controls and equipment; book services—at least 1 year to complete.
• Step 6: Re-design the facility (if needed) and install new controls and equipment—at least 1 year to complete.

---

[9] See email from D. Ailor, COETF, to J. Witt, EPA OAQPS (May 22, 2025), available in the dockets for this rulemaking.

• Step 7: Test new controls, equipment, and software—at least 6 months to complete.

For all the foregoing reasons, it is infeasible for facilities to meet the PQBS MACT standards within 18 months. Therefore, the EPA is revising the deadlines for these standards to July 5, 2027, to allow sufficient time for the industry to comply with the standards.

3. Leak Limits for Doors, Lids, and Offtakes

The COETF indicated that 1 year is not enough time within which to comply with the revised leak limits for doors, lids, and offtakes by the July 7, 2025, deadline. In the Compliance Concerns White Paper, the COETF explained why 3 years are needed to comply with the limits, including:

• The revised limits are based on limited data. In the Variability White Paper, the COETF stated that the annual average leak rate data used in the proposed rule did not reflect raw material, meteorological, and process variability. Therefore, there is uncertainty as to whether the revised limits can be achieved on a consistent basis, and whether additional investments would be needed in order to ensure compliance, which would take additional time.

• Additional time is needed to research and trial new methods and technologies for meeting the limits, and time is needed to engineer, procure, fabricate, deliver, and install any new technologies or materials that would be needed to meet the limits.

• Replacing door machines and rebuilding or replacing oven doors may be necessary to reduce door leaks. The lead time to engineer, procure, fabricate, deliver, and install 2 new door machines is 5 to 6 years, and the lead time to rebuild or replace oven doors on a typical battery with 82 doors is up to 3 years to engineer, procure, fabricate, and install.

• The only method that the COETF has identified for reducing offtake leaks is replacing or redesigning offtake components. The lead time to engineer, procure, fabricate, and install replacement offtake components on a typical battery is at least 2 to 3 years.

For all the foregoing reasons, it is infeasible for facilities to meet the revised leak limits for doors, lids, and offtakes within 1 year. Therefore, the EPA is revising the deadlines for these standards to July 5, 2027, to allow sufficient time for the industry to comply with the standards. This extension is appropriately tied to the timeline considerations above (all of which indicate two to three years is required for compliance).

4. Requirements for Oven Doors at HNR Facilities

SunCoke—the only coke oven facility currently operating HNR facilities—stated that it cannot comply with the revised pressure monitoring requirements for oven doors at HNR facilities until the monitoring procedures outlined in the final rule preamble and the regulatory text (89 FR 55735, July 5, 2024) are clarified. Specifically, the company needs to know who is responsible for generating the performance testing the facility must use to calculate leak averages, the methodology and frequency of monitoring, and more specific information on applicability to the facility of the requirements for certain plant components that the facility does not have. Once the procedure has been clarified, SunCoke has stated that it can comply with the requirements within 1 year. The EPA expects to take final action to clarify procedures for pressure monitoring by June 2026. Therefore, the EPA is revising the deadline for these standards to July 5, 2027, currently July 7, 2025, which is appropriately tailored to this timeline.

*D. Specific Regulatory Revisions*

The regulatory revisions to 40 CFR part 63, subparts L and CCCCC in this action are amending the following sections to revise the relevant compliance deadlines associated with these standards to July 5, 2027:

• 40 CFR 63.302 by revising paragraphs (a)(4) introductory text and (d) introductory text;
• 40 CFR 63.303 by revising paragraphs (a)(1)(iii) and (b)(1)(iii);
• 40 CFR 63.304 by revising paragraph (b)(8) introductory text;
• 40 CFR 63.311 by revising paragraph (h);
• 40 CFR 63.314 introductory text;
• 40 CFR 63.7283 by revising paragraphs (d)(1) and (d)(2);
• 40 CFR 63.7300 by revising paragraph (c)(4) introductory text; and
• 40 CFR 63.7341 by revising paragraph (f).

III. Rulemaking Procedures

As noted in section I.C. of this preamble, the EPA's authority for the rulemaking procedures followed in this action is provided by APA section 553.[10] In general, an agency issuing a rule under the procedures in APA section 553 must provide prior notice and an opportunity for public comment, but APA section 553(b)(B) permits an agency to forego this requirement "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons, therefore, in the rule issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." This action is being issued without prior notice or prior opportunity for public comment because the EPA finds good cause that prior notice and comment would be impracticable under the circumstances.

For the reasons described in detail in section II of this preamble, the EPA finds that prior notice and comment is impracticable here. The EPA has recognized that the original July 2025 and January 2026 compliance deadlines in the Coke Ovens rule are infeasible for regulated parties to meet and therefore must be extended. If the EPA were to seek, evaluate, and respond to comments before finalizing the deadline revisions, it is highly unlikely that the Agency would be able to finalize this action before the July 2025 and January 2026 compliance deadlines, thereby potentially throwing regulated parties into immediate non-compliance. Thus, there is good cause to forego notice and comment to extend the compliance deadlines to July 2027.

In addition to good cause under APA section 553(b)(B) to exempt this action from notice-and-comment requirements, there is also good cause to make this rule effective immediately under APA section 553(d)(1), which provides that the default 30-day effective date can be waived for "a substantive rule which grants or recognizes an exemption or relieves a restriction." This action relieves restrictions by extending the Coke Ovens rule's 2025 and 2026 compliance deadlines.

IV. Request for Comment

As explained in section III of this preamble, the EPA finds good cause to take this interim final action on compliance deadlines without prior notice or opportunity for public comment. However, the EPA is providing an opportunity for and is requesting comment on the content of the matters described in this action that the EPA determined warrant consideration. The EPA is not reopening for comment any provisions of the Coke

---

[10] Under CAA section 307(d)(1)(C), the EPA's promulgation or revision of any standard of performance under CAA section 112 would normally be subject to the rulemaking procedural requirements of CAA section 307(d), including notice-and-comment procedures, but CAA section 307(d) does not apply "in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of [APA section 553(b)]."

Ovens rule other than the specific provisions that are expressly under reconsideration as described in this interim final rule.

## V. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders*.

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is not an economically significant regulatory action as defined in Executive Order 12866 and is therefore not subject to a requirement for Executive Order 12866 review. This interim final rule is expected to result in cost savings due to revised compliance deadlines associated with the PQBS MACT standards and the fenceline monitoring requirements under the July 5, 2024, final rule. The EPA prepared an Economic Impact Analysis (EIA) of the potential cost savings and other economic impacts associated with this action. This analysis, *Economic Impact Analysis for the National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review: Interim Final Rule,* is available in the dockets for this rulemaking.

Table 1 summarizes the estimated changes to compliance costs associated with this interim final action. Costs are measured in 2024 dollars discounted to 2025. This table presents the present values (PV) and equivalent annualized values (EAV) of these estimated impacts discounted using social discount rates of both three and seven percent, in accordance with OMB Circular A–4. The EPA estimates that the interim final rule will result in annualized compliance cost savings of $4.2 million using a 3% social discount rate and $4.4 million using a 7% social discount rate.

TABLE 1—SUMMARY OF COMPLIANCE COST SAVINGS FOR THE INTERIM FINAL RULE, DISCOUNTED TO 2025
[Millions of 2024 dollars]

|  | 3 Percent discount rate | | 7 Percent discount rate | |
| --- | --- | --- | --- | --- |
|  | PV | EAV | PV | EAV |
| Compliance Cost Savings | $8.1 | $4.2 | $7.9 | $4.4 |

**Note:** Estimates are rounded to two significant figures.

### B. Executive Order 14192: Unleashing Prosperity Through Deregulation

This action is considered an Executive order 14192 deregulatory action. Details on the estimated compliance cost savings of this final rule can be found in the EPA's analysis of the potential costs associated with this action. This analysis is contained in the EIA, which is available in the dockets for this rulemaking.

### C. Paperwork Reduction Act (PRA)

This action does not impose any new information collection burden under the PRA. The Office of Management and Budget (OMB) has previously approved the information collection activities that apply to the coke oven facilities affected by this action and has assigned OMB control numbers 2060–0253 (COB NESHAP) and 2060–0521 (PQBS NESHAP). This action does not change the information collection requirements.

### D. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities. There are no small entities in this regulated industry. Additional details of the analysis can be found in the EIA, which is available in the dockets for this rulemaking.

### E. Unfunded Mandates Reform Act of 1995 (UMRA)

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any State, local or Tribal governments or the private sector.

### F. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government.

### G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action does not have Tribal implications as specified in Executive Order 13175. This rule will implement revisions to the compliance dates for certain provisions. Thus, Executive Order 13175 does not apply to this action.

### H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

Executive Order 13045 directs Federal agencies to include an evaluation of the health and safety effects of the planned regulation on children in Federal health and safety standards and explain why the regulation is preferable to potentially effective and reasonably feasible alternatives. This action is not subject to Executive Order 13045 because it is not a significant regulatory action under section 3(f)(1) of Executive Order 12866, and because the EPA does not believe the environmental health or safety risks addressed by this action present a disproportionate risk to children.

### I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

### J. National Technology Transfer and Advancement Act (NTTAA)

This action does not involve technical standards; therefore, the NTTAA does not apply.

### K. Congressional Review Act (CRA)

This action is subject to the CRA, 5 U.S.C. 801–808, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. The CRA allows the issuing agency to make a rule effective sooner than otherwise provided by the CRA if the agency makes a good cause finding that notice-

and-comment rulemaking procedures are impracticable, unnecessary, or contrary to the public interest (5 U.S.C. 808(2)). The EPA has made a good cause finding for this rule as discussed in section III of this preamble, including the basis for that finding.

**List of Subjects in 40 CFR Part 63**

Environmental protection, Administrative practice and procedures, Air pollution control, Hazardous substances, Reporting and recordkeeping requirements.

Lee Zeldin,
*Administrator.*

For the reasons stated in the preamble, the Environmental Protection Agency amends part 63 of title 40, chapter I, of the Code of Federal Regulations as follows:

## PART 63—NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS FOR SOURCE CATEGORIES

■ 1. The authority citation for part 63 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart L—National Emission Standards for Coke Oven Batteries

■ 2. Amend § 63.302 by revising paragraphs (a)(4) introductory text and (d) introductory text to read as follows:

**§ 63.302 Standards for by-product coke oven batteries.**

(a) * * *
(4) On and after July 5, 2027:
\* \* \* \* \*

(d) Emission limitations and requirements applied to each coke oven battery utilizing a new recovery technology shall be less than the following emission limitations or shall result in an overall annual emissions rate for coke oven emissions for the battery that is lower than that obtained by the following emission limitations on and after July 5, 2027:
\* \* \* \* \*

■ 3. Amend § 63.303 by revising paragraphs (a)(1)(iii) and (b)(1)(iii) to read as follows:

**§ 63.303 Standards for nonrecovery coke oven batteries.**

(a) * * *
(1) * * *
(iii) The date for compliance with (a)(1)(i) and (ii) of this section is on and after July 5, 2027.
\* \* \* \* \*
(b) * * *
(1) * * *
(iii) The date for compliance with (b)(1)(i) and (ii) of this section is on and after July 5, 2027, or upon initial startup, whichever is later.
\* \* \* \* \*

■ 4. Amend § 63.304 by revising paragraph (b)(8) introductory text to read as follows:

**§ 63.304 Standards for compliance date extension.**
\* \* \* \* \*
(b) * * *
(8) On and after July 5, 2027:
\* \* \* \* \*

■ 5. Amend § 63.311 by revising paragraph (h) to read as follows:

**§ 63.311 Reporting and recordkeeping requirements.**
\* \* \* \* \*
(h) *Electronic reporting of compliance certification reports.* Beginning on July 5, 2027, or once the report template for this subpart has been available on the EPA's Compliance and Emissions Data Reporting Interface (CEDRI) website for one year, whichever date is later, submit all subsequent reports to the EPA via the CEDRI according to § 63.9(k) except that confidential business information (CBI) should be submitted according to paragraph (k) of this section.
\* \* \* \* \*

■ 6. Amend § 63.314 by revising the introductory text to read as follows:

**§ 63.314 Fenceline monitoring provisions.**

For each by-product coke oven battery facility as defined in § 63.301 of this subpart, beginning no later than July 5, 2027, the owner or operator of a coke manufacturing facility shall conduct sampling along the facility property boundary and analyze the samples in accordance with paragraphs (a) through (g) of this section.
\* \* \* \* \*

### Subpart CCCCC—National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks

■ 7. Amend § 63.7283 by revising paragraphs (d)(1) and (2) to read as follows:

**§ 63.7283 When do I have to comply with this subpart?**
\* \* \* \* \*
(d) * * *
(1) If you have an existing affected source or a new or reconstructed affected source for which construction or reconstruction commenced on or before August 16, 2023, you must be in compliance no later than July 5, 2027.

(2) If you have a new or reconstructed affected source for which construction or reconstruction commenced after August 16, 2023, you must be in compliance no later than July 5, 2027, or upon startup, whichever is later.
\* \* \* \* \*

■ 8. Amend § 63.7300 by revising paragraph (c)(4) introductory text to read as follows:

**§ 63.7300 What are my operation and maintenance requirements?**
\* \* \* \* \*
(c) * * *
(4) Beginning July 5, 2027, you must identify and implement a set of site-specific good combustion practices for each battery. These good combustion practices should correspond to your standard operating procedures for maintaining the proper and efficient combustion within battery waste heat flues. Good combustion practices include, but are not limited to, the elements listed in paragraphs (c)(4)(i) through (v) of this section.
\* \* \* \* \*

■ 9. Amend § 63.7341 by revising paragraph (f) to read as follows:

**§ 63.7341 What reports must I submit and when?**
\* \* \* \* \*
(f) *Electronic reporting of compliance reports.* Beginning on July 5, 2027, or once the report template for this subpart has been available on the CEDRI website for one year, whichever date is later, submit all subsequent reports to the EPA via the CEDRI according to § 63.9(k) except that confidential business information (CBI) should be submitted according to paragraph (h) of this section.
\* \* \* \* \*

[FR Doc. 2025–12626 Filed 7–3–25; 8:45 am]
**BILLING CODE 6560–50–P**

---

## DEPARTMENT OF THE INTERIOR

**Fish and Wildlife Service**

**50 CFR Part 17**

[Docket No. FWS–R4–ES–2019–0081; FXES11130900000–234–FF09E22000]RIN 1018–BD95

**Endangered and Threatened Wildlife and Plants; Removal of the Dwarf-flowered Heartleaf From the List of Endangered and Threatened Plants**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.