<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 25-1166

GASP, *et al.*,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Respondents*.

Petition for Review of Final Administrative Action of the
United States Environmental Protection Agency

**MOTION FOR SUMMARY VACATUR OR,
IN THE ALTERNATIVE, A STAY PENDING JUDICIAL REVIEW**

/s/ *Tosh Sagar*
Tosh Sagar
Adrienne Y. Lee
Kevin Breiner
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 667-4500
tsagar@earthjustice.org
alee@earthjustice.org
kbreiner@earthjustice.org

*Counsel for GASP, Hoosier Environmental
Council, Just Transition Northwest Indiana,
PennFuture, and Sierra Club*

*/s/ David Bookbinder*
David Bookbinder
Director of Law and Policy
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, D.C. 20006
(202) 469-3151
dbookbinder@environmentalintegrity.org

Haley Lewis
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, D.C. 20006
(202) 263-4449
hlewis@environmentalintegrity.org

**Dated**:      **August 11, 2025**          *Counsel for Clean Air Council and PANIC*

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................1

BACKGROUND .......................................................................................3

    I.     Statutory Background ......................................................................3

    II.    Factual Background and Procedural History.................................4

STANDING .............................................................................................7

STANDARD OF REVIEW ......................................................................9

ARGUMENT ........................................................................................10

    I.     EPA's Use of the Good Cause Exception is Foreclosed by this Court's Precedents, so the Interim Rule Must Be Summarily Vacated. ................10

    II.    Alternatively, Petitioners Are Entitled to a Judicial Stay...........................14

        A.   Petitioners are likely to succeed on the merits..................................14

        B.   Petitioners and their members are being irreparably harmed............18

        C.   The balance of the equities favors allowing the 2024 Rule to go into effect on schedule. ..............................................................21

CONCLUSION .....................................................................................23

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT.................25

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE

PROCEDURE 18 AND CIRCUIT RULE 18.......................................................26

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ...........................................27

CERTIFICATE OF PARTIES.................................................................28

i

CERTIFICATE OF SERVICE ...................................................................29

(Page 4 of Total)

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Air All. Houston v. EPA,*
  906 F.3d 1049 (D.C. Cir. 2018)............................................................15

*Am. Fed'n of Gov't Emp., AFL-CIO v. Block,*
  655 F.2d 1153 (D.C. Cir. 1981) ...........................................................13

*Buschmann v. Schweiker,*
  676 F.2d 352 (9th Cir. 1982) ...............................................................11

*Cascade Broad. Grp. Ltd. v. FCC,*
  822 F.2d 1172 (D.C. Cir. 1987)..............................................................9

*Citizens for Pennsylvania's Future v. Wheeler,*
  469 F. Supp. 3d 920 (N.D. Cal. 2020)..............................................5, 21

*Clean Wisconsin v. EPA,*
  964 F.3d 1145 (D.C. Cir. 2020)........................................................8, 20

*Coburn v. McHugh,*
  679 F.3d 924 (D.C. Cir. 2012)..............................................................17

*Consumer Energy Council of Am. v. FERC,*
  673 F.2d 425 (D.C. Cir. 1982)..............................................................13

*Cuomo v. U.S. Nuclear Regul. Comm'n,*
  772 F.2d 972 (D.C. Cir. 1985)..............................................................21

*Env't Def. Fund v. EPA,*
  716 F.2d 915 (D.C. Cir. 1983)..............................................11, 12, 13

*Env't Def. Fund v. EPA,*
  922 F.3d 446 (D.C. Cir. 2019)................................................................9

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009)........................................................15, 16, 17, 18

iii

*Friends of the Earth v. Laidlaw Env't Servs.*,
  528 U.S. 167 (2000).................................................................8

*Louisiana Env't Action Network v. EPA*,
  955 F.3d 1088 (D.C. Cir. 2020)........................................5, 21

*Mack Trucks v. EPA*,
  682 F.3d 87 (D.C. Cir 2012).................................10, 11, 12, 14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*
  *Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..............................................................18

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
  53 F.4th 869 (5th Cir. 2022)..............................................11

*Nat'l Lime Ass'n v. EPA*,
  233 F.3d 625 (D.C. Cir. 2000)...........................................21

*Nken v. Holder*,
  556 U.S. 418 (2009)...........................................................10

*NRDC v. EPA*,
  749 F.3d 1055 (D.C. Cir. 2014)............................................8

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
  374 F.3d 1209 (D.C. Cir. 2004)....................................14, 15

*State of New Mexico v. Watkins*,
  969 F.2d 1122 (D.C. Cir. 1992).........................................18

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001)...........................................................21

*Util. Solid Waste Activities Grp. v. EPA*,
  236 F.3d 749 (D.C. Cir. 2001)...............................10, 11, 12, 14

**STATUTES**

5 U.S.C. § 553(b)(B) ..................................................................4

5 U.S.C. § 706(2)(A), (C) ...........................................................9

42 U.S.C. § 7412.........................................................................3

iv

42 U.S.C. § 7412(d)(6)................................................................3, 21

42 U.S .C. § 7412(f)(2) ..............................................................3, 21

42 U.S.C. § 7412(i)(3)(A) ..........................................................3, 14

42 U.S.C. § 7412(i)(3)(B) ..........................................................3, 16

42 U.S.C. § 7607(d)(1)(C) .............................................................3

42 U.S.C. § 7607(d)(7)...................................................................3

42 U.S.C. § 7607(d)(9)(A), (C)......................................................9

**FEDERAL REGISTER NOTICES**

89 Fed. Reg. 55,684 (July 5, 2024).................... 4, 5, 9, 17, 18, 19, 21, 22

90 Fed. Reg. 29,997 (July 8, 2025)............... 4, 6, 7, 8, 11, 12, 14, 15, 16, 17, 19, 23

v

## **<u>GLOSSARY</u>**

Pursuant to D.C. Circuit Rule 28(a)(3), the following is a glossary of

acronyms and abbreviations used in this brief:

| | |
|---|---|
| 2024 Rule | 89 Fed. Reg. 55,684 (July 5, 2024) |
| Coke Oven Communities or Communities | Clean Air Council, GASP, Hoosier Environmental Council, Just Transition Northwest Indiana, PANIC, PennFuture, and Sierra Club |
| EPA | United States Environmental Protection Agency |
| HAP | Hazardous Air Pollutant |
| Interim Rule | 90 Fed. Reg. 29,997 (July 8, 2025) |

**INTRODUCTION**

Clean Air Council, GASP, Hoosier Environmental Council, Just Transition Northwest Indiana, PANIC, PennFuture, and Sierra Club (collectively, "Coke Oven Communities" or "Communities") hereby move for summary vacatur, or alternatively, a stay pending judicial review, of the final action taken at 90 Fed. Reg. 29,997 (July 8, 2025), entitled "National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review" ("Interim Rule") (Exh. 15), pursuant to Federal Rules of Appellate Procedure 18 and 27.

In the Interim Rule, the Environmental Protection Agency ("EPA") unlawfully delays new regulatory protections from highly toxic coke oven emissions, continuing EPA's years-long pattern of failing Coke Oven Communities. For over a decade, EPA unlawfully failed to update Clean Air Act standards for coke ovens. Finally, in 2024 and acting under a court order secured by many of the Communities, EPA issued modest, sensible, and important new protections.

Just as those new protections were beginning to take effect in July 2025, EPA ripped them away by delaying the compliance deadlines to July 2027. EPA did so without providing notice or any opportunity to comment on why the existing

1

deadlines should be left in place, shutting Coke Oven Communities out of the rulemaking process.

The Court should summarily vacate the Interim Rule, because the Clean Air Act and this Court's precedents clearly required EPA to use notice-and-comment rulemaking. This Court has stressed that there must be an emergency to justify skipping notice-and-comment rulemaking, but there was no emergency here. Instead, EPA had all the relevant information in its possession for 10 months but simply waited until the compliance deadlines kicked in before issuing the Interim Rule.

Alternatively, the Court should stay the Interim Rule. The merits strongly favor the Communities: in addition to the procedural defects, the Interim Rule's new compliance deadlines are arbitrary. The Interim Rule concludes that industry could not comply by the original deadlines, but EPA has <u>twice</u> rejected that argument, including as recently as March 2025. And the Interim Rule offers no support for EPA's about-face. The Interim Rule irreparably harms the Communities by delaying protections from toxic pollutants, and the remaining equitable factors further favor a stay.

2

## BACKGROUND

### I.      Statutory Background

The Clean Air Act requires EPA to establish standards for each category of major sources that emit hazardous air pollutants ("HAP"), including coke ovens. *See generally* 42 U.S.C. § 7412. Then, on mandated timeframes, EPA must review and, as required, revise those standards. *Id.* § 7412(d)(6), (f)(2). For each new standard, EPA must set an accompanying compliance deadline, "which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard." *Id.* § 7412(i)(3)(A).

After setting a standard and its accompanying compliance deadline, EPA may provide a compliance extension of no more than one year to an individual facility if it can show such additional time "is necessary for the installation of controls." *Id.* § 7412(i)(3)(B). EPA may also reconsider a standard (including any associated compliance deadline) by rulemaking, and where such reconsideration is mandatory, EPA may stay the standard for three months while the reconsideration rulemaking is ongoing. 42 U.S.C. § 7607(d)(7).

The Act ordinarily requires EPA to conduct notice-and-comment rulemaking when revising such standards (including revising compliance deadlines). 42 U.S.C. § 7607(d)(1)(C) (rulemaking procedures apply to revisions promulgated under § 7412(d), (f)). However, the Act exempts EPA from those notice-and-comment

requirements in specific circumstances prescribed by the Administrative Procedure

Act. *Id.* As relevant here, notice-and-comment procedures are not required "when

the agency for good cause finds . . . that notice and public procedure thereon are

impracticable." 5 U.S.C. § 553(b)(B); *see* 90 Fed. Reg. 30,002 n. 10.

## II.     Factual Background and Procedural History

1.       Currently, 11 coke oven facilities operate in the United States, and

EPA's most recent estimate is that coke ovens emit nearly 2,400 tons of hazardous

air pollutants annually. 89 Fed. Reg. 55,684, at 55,723 (July 5, 2024) ("2024

Rule") (Exh. 16); EPA, Residual Risk Assessment, App. 1 at 9 (May 2023) ("2023

Risk Assessment") (available at https://www.regulations.gov/document/

EPA-HQ-OAR-2002-0085-0814) (excerpted at Exh. 17). According to EPA,

"[c]oke oven emissions are among the most toxic of all air pollutants." EPA, Fact

Sheet-Coke Oven NESHAP, at 1 (available at https://www.epa.gov/sites/default/

files/2016-01/documents/cokefact.pdf). Coke oven facilities flagrantly violate

applicable Clean Air Act standards, with at least three coke oven facilities having

"High Priority" Clean Air Act violations in every quarter over the prior 3 years.[1]

---

[1] EPA, Clairton Plant Detailed Facility Report (available at
https://echo.epa.gov/detailed-facility-report?fid=110042043384); EPA, EES Coke
Battery LLC Detailed Facility Report (available at https://echo.epa.gov/detailed-
facility-report?fid=110070374301); EPA, Haverhill Coke Company Detailed
Facility Report (available at https://echo.epa.gov/detailed-facility-
report?fid=110054816703). *See, also,* EPA, ABC Coke Detailed Facility Report

4

2.      For years, EPA shirked its obligations to update the Clean Air Act standards for coke ovens, so a coalition of groups, including many of the Coke Oven Communities, sued EPA to force the agency to update those standards. *Citizens for Pennsylvania's Future v. Wheeler*, 469 F. Supp. 3d 920, 924-25 (N.D. Cal. 2020) ("*PennFuture*") (holding EPA unlawfully failed to review and update coke oven standards).

3.      On July 5, 2024, EPA finalized updated emission standards for coke ovens, acting pursuant to the court's order in *PennFuture*. 89 Fed. Reg. at 55,684. As relevant here, the 2024 Rule imposed three important new protections. First, it corrected EPA's prior errors which had left numerous HAP emissions wholly unregulated, setting new "floor" standards to comply with this Court's decision in *Louisiana Env't Action Network v. EPA*, 955 F.3d 1088, 1098 (D.C. Cir. 2020) ("*LEAN*"). 89 Fed. Reg. at 55,686. Second, it tightened the limits on coke oven leaks. *Id.* EPA concluded that these changes were modest and eminently achievable, as no facility would be required to install new pollution controls to meet the new standards. *Id.* at 55,696, 55,717. Third, EPA established a fenceline monitoring and corrective action standard. *Id.* at 55,694. As part of the standard, an

---

(available at https://echo.epa.gov/detailed-facility-report?fid=110000366817) (identifying two "High Priority" violations in prior 12 quarters).

operator must place air monitors "along the perimeter of [the] facility" to measure the level of benzene. *Id.*

The 2024 Rule established compliance deadlines for each of these three new sets of standards, which ranged from July 7, 2025 (lowered leak limits and fenceline monitoring), to January 5, 2026 (new floor standards). *Id.* at 55,690.

4.    Two coke oven trade associations sought to have this rule overturned. They filed petitions for administrative reconsideration with EPA on September 3, 2024, alleging various errors in the 2024 Rule. *See* 90 Fed. Reg. at 29,999. They also filed petitions for review in this Court and moved to have the 2024 Rule stayed, raising many of the same arguments raised in their petitions for administrative reconsideration. *See* Case No. 24-1287, Doc. Nos. 2072643 (Aug. 30, 2024), 2077499 (Sept. 30, 2024).[2]

Coke Oven Communities and EPA both opposed the stay motion. This Court denied the industry requests to stay the Rule. *See* Case No. 24-1287, Doc. No. 2087361 (Dec. 2, 2024).

5.    Following the change in administration, EPA successfully moved to hold the petitions challenging the 2024 Rule in abeyance so that the agency could

---

[2] The Coke Oven Communities also sought review of the Rule, seeking to strengthen several of its provisions, but did not seek a stay.

review and act on the industry reconsideration petitions. *See* Case No. 24-1287, Doc. Nos. 2100411 (Feb. 12, 2025), 2111581 (Apr. 17, 2025).

In March 2025, while EPA's abeyance request was still pending before this Court, every coke oven company "requested extensions for the compliance dates in the [2024 Rule] under CAA section 112(i)(3)(B)." 90 Fed. Reg. at 30,001. EPA denied those requests because the companies failed to demonstrate that they would not be able to comply with the standards by the existing deadlines. *Id.*

Then, on July 8, 2025, one day <u>after</u> the 2024 Rule's compliance deadlines began to take effect, EPA promulgated the Interim Rule, delaying the compliance deadlines for the three sets of new standards to July 2027. 90 Fed. Reg. at 29,997. EPA acknowledged that modifying the compliance deadlines would ordinarily require notice-and comment rulemaking under the Clean Air Act, but EPA declined to provide a comment opportunity. 90 Fed. Reg. at 30,002 n. 10. Instead, EPA claimed that notice-and-comment rulemaking procedures were "impracticable," and therefore, invoked the APA's "good cause" exception from notice-and-comment rulemaking. *Id.* at 30,002 (citing 5 U.S.C. § 553(b)(B)).

## STANDING

The Coke Oven Communities are nonprofit groups that advocate for stronger health protections and a cleaner environment for their members and the general public. Brooks, Fox, Isherwood, McDonnell, Milton, Powell, & Williams

Decls. (Exhs. 4, 6, 7-9, 12, 14). The Communities' members and their families live, work, and recreate near coke ovens, and as a result are exposed to coke oven emissions, which diminishes enjoyment of their daily lives. *E.g.,* Abeyta, Ansari, Ballinger, Brown, Mulvhill, Peller, & Vallee Decls. (Exhs. 1-3, 5, 10, 11, 13). Many are especially sensitive to air pollution—because of underlying health conditions or because they live with young children—and must take onerous precautions to protect themselves, including staying indoors or driving to out-of-town locations for relief from polluted air. *E.g.,* Brown & Ballinger Decls.

The Interim Rule prolongs and exacerbates those harms by delaying compliance with the 2024 Rule's pollution prevention requirements, such as the new floor standards and tightened leak limits. 90 Fed. Reg. at 29,997. This Court could remedy those injuries by vacating the Interim Rule, thereby ensuring coke ovens begin complying with the 2024 Rule on schedule rather than in 2027. *NRDC v. EPA*, 749 F.3d 1055, 1062 (D.C. Cir. 2014) (finding standing where petitioners' members alleged they would be harmed by higher emissions allowed by challenged rule); *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020) (Petitioners are injured by EPA actions that "expose them to higher [pollution] levels."); *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 183 (2000) (finding standing based on "aesthetic and recreational" injuries).

8

Additionally, by delaying the fenceline monitoring requirements until 2027, the Interim Rule deprives the Communities of useful emissions data that the 2024 Rule required facilities to collect and EPA to disseminate. *Env't Def. Fund v. EPA*, 922 F.3d 446, 452-53 (D.C. Cir. 2019); 89 Fed. Reg. at 55,701 (describing requirements of fenceline monitoring standard).

## STANDARD OF REVIEW

The Administrative Procedure Act and Clean Air Act require a court to set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); 42 U.S.C. § 7607(d)(9)(A), (C).

This Court "encourage[s]" parties to file motions for summary dispositions of a case "where a sound basis exists for summary disposition." U.S. Court of Appeals for the District of Columbia Circuit, *Handbook of Practice and Internal Procedures*, at 36 (Dec. 12, 2024) (https://www.cadc.uscourts.gov/sites/cadc/files/rules-Handbook20241212.pdf). Summary vacatur "will be granted where the merits of the [] petition for review are so clear that plenary briefing, oral argument, and the traditional collegiality of the decisional process would not affect our decision." *Cascade Broad. Grp. Ltd. v. FCC*, 822 F.2d 1172, 1174 (D.C. Cir. 1987) (citation modified).

9

This Court considers four factors when evaluating applications for a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation modified).

## ARGUMENT

### I.    EPA's Use of the Good Cause Exception is Foreclosed by this Court's Precedents, so the Interim Rule Must Be Summarily Vacated.

The Interim Rule should be summarily vacated because this Court's precedents foreclose EPA's use of the good cause exception to end-run notice-and-comment rulemaking. Here, there is no emergency, which is a prerequisite for utilizing the good cause exception. Instead, EPA had ample time to conduct a notice-and-comment rulemaking because EPA has been aware of the alleged problems with the 2024 Rule for 10 months, ever since the industry submitted administrative reconsideration petitions in September 2024.

This Circuit has "repeatedly made clear that the good cause exception is to be narrowly construed and only reluctantly countenanced." *Mack Trucks v. EPA*, 682 F.3d 87, 93 (D.C. Cir 2012) (citation modified). "The exception is not an 'escape clause'; its use 'should be <u>limited to emergency situations</u>.'" *Util. Solid*

*Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) ("*USWAG*") (citation modified) (emphasis added); *Mack Trucks*, 682 F.3d at 93 (similar).[3] Good cause exists where notice-and-comment rulemaking is "impracticable," meaning there is an "imminent" threat to human lives or property or a rule is of "life-saving importance." *Mack Trucks*, 682 F.3d at 93 (citation modified) (summarizing Circuit precedent on impracticability); *see also USWAG*, 236 F.3d 755 (similar).[4] An agency cannot "simply wait until the eve of a[n] . . . administrative deadline, then raise up the good cause banner and promulgate rules without following [statutory] procedures." *Env't Def. Fund v. EPA*, 716 F.2d 915, 921 (D.C. Cir. 1983) (citation modified).

1.    EPA's Interim Final Rule is unlawful because "[t]here is no indication that [the 2024 Rule] posed any threat to the environment or human health or that some sort of emergency had arisen." *USWAG*, 236 F.3d at 755. Nowhere in the Interim Rule does EPA claim, let alone demonstrate, that such an emergency exists. 90 Fed. Reg. at 30,002 (absence). Because there was no emergency, notice-

---

[3] Other Circuits agree. *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982) ("The good cause exception is essentially an emergency procedure."); *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 883 (5th Cir. 2022) (The APA's good cause except "is narrow authority reserved for emergency situations." (citation modified)).

[4] Here, EPA only claims that notice-and-comment rulemaking would have been "'impracticable,'" not that it was "'unnecessary[] or contrary to the public interest.'" 90 Fed. Reg. at 30,002 (quoting 5 U.S.C. § 553(b)(B)).

11

and-comment rulemaking was not impracticable and EPA's use of the good cause exception is unlawful. *USWAG*, 236 F.3d at 755; *Mack Trucks*, 682 F.3d at 93.

2.    In lieu of an emergency, EPA proffers an alternative rationale based on the immediacy of the compliance deadlines, but this Court has made clear that EPA may not "simply wait until the eve of a[n] . . . administrative deadline," and then use the imminence of the deadline to invoke good cause. *Env't Def. Fund,* 716 F.2d at 921 (rejecting EPA's claim that "good cause" existed due to impending compliance deadlines).

EPA claims that (1) the 2024 Rule's original "compliance deadlines . . . are infeasible" and that (2) if EPA conducted notice-and-comment rulemaking, it could not finalize changes before compliance is required, thereby "throwing regulated parties into immediate non-compliance" with the 2024 Rule. 90 Fed. Reg. at 30,002. In turn, EPA's belief that the 2024 Rule's original "compliance deadlines . . . are infeasible" is based on information in the September 2024 industry reconsideration petitions. *Id.*; *see id.* at 30,000-02 (describing need to conduct reconsideration based on industry petitions and invoking those issues to justify use of good cause exception).

In other words, EPA had ten months to conduct a new rulemaking to address the supposed compliance challenges identified in September 2024, and an agency cannot use good cause to avoid notice-and-comment rulemaking where it "ha[s] a

12

substantial period of time within which to prepare regulations." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981) (summarizing prior cases in which good cause did not exist). Even assuming EPA is correct that the September 2024 reconsideration petitions demonstrate compliance challenges, EPA could have quickly begun a rulemaking after receiving the petitions and solicited public comments on revised compliance dates.

Having delayed acting until the compliance deadlines arrived, EPA cannot use the immediacy of those compliance deadlines to establish good cause. *Id.; see Env't Def. Fund*, 716 F.2d at 921 ("the good cause exception does not apply when an alleged 'emergency' arises as the result of an agency's own delay").[5] In the absence of any actual emergency, EPA unlawfully "wait[ed] until the eve of a[n] . . . administrative deadline, then raise[d] up the 'good cause' banner" to evade the Clean Air Act's notice-and-comment rulemaking requirements. *Env't Def. Fund*, 716 F.2d at 921 (citation modified).

---

[5] To the extent that the Interim Rule can be read to argue that errors (other than the compliance dates) in the 2024 Rules justify use of the good cause exception, that argument has also been rejected by this Court: even if the 2024 Rules "were defective [that] does not explain why notice and comment could not be provided." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 448 (D.C. Cir. 1982) ("The fact that [the agency] considered these regulations defective did not imply that an emergency existed.").

13

3.    Because EPA unlawfully avoided the Act's mandatory notice-and-comment requirements in the absence of good cause, the Interim Rule must be vacated. *USWAG*, 236 F.3d at 755; *Mack Trucks*, 682 F.3d at 95.

## II.    Alternatively, Petitioners Are Entitled to a Judicial Stay.

### A.    Petitioners are likely to succeed on the merits.

1.    As described in Section I, Petitioners are entitled to summary vacatur because they have demonstrated that EPA's use of the good cause exception to avoid notice-and-comment rulemaking was unlawful. That alone establishes a likelihood of success on the merits.

2.    Additionally, the new compliance dates in the Interim Rule are arbitrary, capricious, or otherwise not in accordance with law, further supporting a stay.

First, EPA failed to apply the statutory test for setting compliance deadlines, and therefore "the agency neglected to consider a statutorily mandated factor." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004). The Act requires EPA to set deadlines that "provide for compliance as expeditiously as practicable" (but not longer than three years after a rule's effective date). 42 U.S.C. § 7412(i)(3)(A). But the Interim Rule never even mentions, let alone applies, that statutory requirement. 90 Fed. Reg. at 30,000-02 (failing to cite to or reference § 7412(i)(3)(A) or the "as expeditiously as practicable" standard).

14

"[T]he complete absence of any discussion" of a statutorily mandated factor leaves [the Court] with no alternative but to conclude that the agency failed to take account of this statutory limit on its authority, making the agency's reasoning arbitrary and capricious." *Pub. Citizen*, 374 F.3d at 1216.

"[C]ompliance dates must be <u>justified</u> in terms of assuring compliance as expeditiously as practicable," but EPA offered no such justification here. *Air All. Houston v. EPA*, 906 F.3d 1049, 1067 (D.C. Cir. 2018) (emphasis added) (citation modified) (interpreting analogous provision of § 7412 which mandates deadlines that "assure[] compliance as expeditiously as practicable"). Instead, EPA chose the three-year statutory maximum (here, July 5, 2027) as the revised compliance deadline for all the standards, but never explained why more expeditious compliance was not practicable. EPA concluded only that the new deadline would be "sufficient time" for compliance for each of the standards, without analyzing whether sources could comply in less time. *See* 90 Fed. Reg. at 30,001-02 (analyzing "Fenceline Monitoring," "PQBS MACT Standards," and "Leak Limits for Doors, Lids, and Offtakes").

Second, EPA twice considered and rejected many of the industry arguments on which it now bases its decision to delay the compliance dates, and the agency fails to provide a "reasoned explanation [] for disregarding facts and circumstances that underlay . . . [a] prior policy." *FCC v. Fox Television Stations, Inc.,* 556 U.S.

15

502, 516 (2009). EPA's determination that "that compliance challenges necessitate changes to the compliance dates," 90 Fed. Reg. at 30,001, is based on information that was available to EPA when it considered and rejected industry's bid for more time to comply not once, but twice: in the 2024 Rule, and again in March 2025.

The Interim Rule's conclusion that additional time is needed for compliance is directly at odds with the findings EPA made in March 2025, yet EPA arbitrarily fails to explain its change in position. *Fox Television,* 556 U.S. at 516. "In March 2025, all companies operating cokemaking facilities in the U.S. requested extensions for the compliance dates in the final rule under CAA section 112(i)(3)(B)." 90 Fed. Reg. at 30,001. Under that provision, EPA considered whether additional time was "necessary for the installation of controls" to comply with the 2024 Rule. 42 U.S.C. § 7412(i)(3)(B). Yet, EPA rejected those industry requests, concluding "they did not provide enough information to determine whether the compliance date extensions were warranted." 90 Fed. Reg. at 30,001. Now EPA concludes that "additional controls may indeed be necessary . . . which provides compelling reason for the EPA to revise the deadlines." *Id.*

Yet, the Interim Rule never explains what changed from March 2025. It does not present any new data that the agency received in the intervening months. It does not present any new interpretation of the existing data that the agency has had since September 2024. Thus, the Interim Rule fails even the most minimal

16

requirements of reasoned decision-making: "At the very least, the [agency] must provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *Coburn v. McHugh*, 679 F.3d 924, 934 (D.C. Cir. 2012) (citation modified).

Similarly, EPA already considered and rejected the industry objections in the 2024 Rule, but EPA again fails to provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay" its prior position. *Fox Television,* 556 U.S. at 515-16. For example, the Interim Rule delays the compliance deadlines for new leak limits based, in part, on industry concerns that the use of "annual average leak rate data" to calculate leak limits lead to overly stringent limits. 90 Fed. at 30,002. The Interim Rule attributes this concern to information identified in industry white papers that were submitted after comments closed. *Id.*

But these concerns about using annual averages were fully raised by industry in the 2024 rulemaking and accounted for by EPA. Responding to industry concerns about the use of annual averages, EPA incorporated rolling 30-day average data, just as industry demanded in its comments. *See* 89 Fed. Reg. at 55,696.[6] EPA ultimately concluded that sources could comply with the new leak

---

[6] The white paper cited in the Interim Rule confirms that industry's concern about EPA's use of "annual average leak rates without considering . . . the 30-day rolling

limits because the new leak limits are still higher than what facilities emit on an averaged 30-day basis. *Id.*

In short, EPA fails to explain why it has changed its mind. Much of the supposedly new information was already considered and rejected by EPA in the 2024 Rule (and again in March 2025), yet the Interim Rule fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Fox Television,* 556 U.S. at 515-16.

### B.     Petitioners and their members are being irreparably harmed.

Each day the Interim Rule is in place, Coke Oven Communities are denied the benefits of the 2024 Rule, including protections against exposure to coke oven emissions and vital information about pollution in their area. Those injuries are irreparable and justify a stay. *State of New Mexico v. Watkins*, 969 F.2d 1122, 1137 (D.C. Cir. 1992) ("Environmental injury, by its nature, can seldom be adequately

---

average form of the standard" was not new but something that industry "ha[d] previously commented to EPA." Coke Ovens Environmental Task Force, Compliance Concerns White Paper (Exh. 18) (available at https://downloads.regulations.gov/EPA-HQ-OAR-2003-0051-1882/attachment_4.pdf). And EPA went above and beyond in the 2024 Rule, considering the data that industry submitted after the comment period closed and then later repackaged in the white papers. 89 Fed. Reg. at 55,696 (noting EPA considered the late-submitted industry data).

remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987))).

1.    Absent EPA's unlawful conduct, coke ovens would be required to comply with the 2024 Rule's tightened standards for coke ovens, which would protect the Communities from increased pollution. First, the Interim Rule delays the compliance deadlines for new lowered leak limits, which were set to take effect in July 2025. Consequently, facilities can operate leakier ovens without consequence for an additional two years.

Second, the Interim Rule allows coke ovens to continue emitting an unlimited amount of certain pollutants for an additional 18 months by delaying compliance deadlines for the new floor standards. The 2024 Rule established limits for 18 different HAP emissions that EPA had left wholly unregulated for decades and required sources to come into compliance by January 2026. *See* 90 Fed. Reg. at 29,999, 30,001. These new standards would "ensure that emission of HAP do not increase and that air quality does not degrade over time." 89 Fed. Reg. at 55,723. Instead, the Interim Rule allows coke ovens to emit unlimited amounts of these pollutants through July 2027.

Any additional emissions or exposure constitutes irreparable harm, particularly here because there is no safe level for many of the pollutants emitted

19

by coke ovens.[7] In addition, many of the pollutants emitted by coke ovens are persistent and bioaccumulative, meaning they will contaminate soil, water, and even foods long after they are emitted into the air. EPA, Residual Risk Assessment at 17-23. Thus, increased emissions of these hazardous air pollutants constitute a harm that cannot be undone. *Clean Wisconsin*, 964 F.3d at 1158 ("[M]ore [pollution] is more pollution.").

2.    The Interim Rule also deprives the Communities of emissions information that would have been collected and provided to the public under the 2024 Rule's fenceline monitoring program. *See* Abeyta, Fox, Isherwood, Milton & Peller Decls. The Rule required facilities to begin monitoring for benzene in July 2025. But if monitors are not installed until July 2027, the Communities will permanently lose out on two years of data.

3.    By prolonging and increasing the toxic emissions from coke ovens, the Interim Rule robs the Communities and their members of their daily enjoyment

---

[7] Coke ovens emit numerous toxic constituents for which there is no safe level of exposure, including dangerous carcinogens and lead. *See* National Institute for Occupational Safety and Health, DHHS, Chemical Carcinogen Policy, Publication No. 2017-100 (last revised July 2017) ("there is no safe level of exposure to a carcinogen") (available at https://www.cdc.gov/niosh/docs/2017-100/default.html); EPA, *Basic Information about Lead in Drinking Water* ("The best available science [] shows there is no safe level of exposure to lead.") (available at https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water).

20

of their lives and activities in their own homes and communities, a loss that

is permanent.

    **C.**     **The balance of the equities favors allowing the 2024 Rule to go into effect on schedule.**

    1.     EPA already made the 1.3 million people living near coke ovens wait

for over a decade before updating coke oven standards in 2024. 89 Fed. Reg. at

55,725 (identifying population that lives within 10 km of a coke oven facility); *see*

*PennFuture,* 469 F. Supp. 3d at 924-25 (describing overdue rulemaking). Those

people should not be made to wait longer to receive protections to which they are

statutorily entitled.

    The 2024 Rule's updated standards reflect Congress's demands that, among

other things, EPA: update standards by a date-certain; regulate all HAP emissions;

and fill in any missing limits for previously unregulated HAPs. 42 U.S.C.

§ 7412(d)(6), (f)(2); *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 634 (D.C. Cir. 2000);

*LEAN*, 955 F.3d at 1098.

    The need to fulfill those Congressional mandates decisively favors allowing

the 2024 Rule to take effect on schedule. *See United States v. Oakland Cannabis*

*Buyers' Coop.*, 532 U.S. 483, 497 (2001); *Cuomo v. U.S. Nuclear Regul. Comm'n.*,

772 F.2d 972, 978 (D.C. Cir. 1985).

    2.     On the other side of the ledger, there are no harms to EPA and only

minimal compliance obligations on the coke oven industry. Thus, the balance of

21

the equities favor allowing the 2024 Rule to go into effect on schedule, as EPA itself acknowledged less than a year ago in successfully urging this Court not to stay the 2024 Rule. Case No. 24-1287, Doc. No. 2081415 at 1-2, 30-34 (Oct. 22, 2024) ("EPA Stay Opp'n").

First, a stay would not injure EPA, which is free to continue with its reconsideration of the 2024 Rule.

Second, there would be minimal burdens on the regulated industry. In the 2024 Rule, EPA made detailed factual findings, concluding: (1) no new pollution controls are required to comply with the tightened leak standards or the new floors; and (2) the cost of the fenceline monitoring program would be roughly only $107,000 per facility per year. 89 Fed. Reg. at 55,696 (finding no "need for any new controls or operating costs" for leak standards), *id.* at 55,717 (similar for new floor standards), *id.* at 55,732 (estimating costs of fenceline monitoring); *see* EPA Stay Opp'n at 33 ("EPA found that all facilities will be able to meet the standards here without any modifications at all."). These findings in the 2024 Rule were the product of a years-long rulemaking process, which considered and incorporated data the coke industry submitted to the agency before, during, and even after, the public comment period.

The Interim Rule does not undermine the 2024 Rule's detailed and well-supported findings. The Interim Rule fails to rationally explain its repudiation of

22

EPA's findings in the 2024 Rule or EPA's change of position from March 2025, when EPA rejected industry's requests for additional time to comply. *Supra* at 15-17. Thus, the Interim Rule's new findings—that the industry faces challenges to comply on-schedule—are unsupported and unexplained and should carry no weight. Additionally, the Interim Rule is equivocal, stating that compliance with some standards "<u>may</u> be infeasible" because operational changes "<u>may</u> be required." 90 Fed. Reg. at 30,001 (emphasis added). Even if individual facilities may face compliance challenges, those speculative burdens do not outweigh the harms to Coke Oven Communities, or the broader public, who have been without protections for years.

Ultimately, the companies have had a full year to plan for compliance with the 2024 Rule's modest requirements, and there is no inequity in requiring them to do so now.

## CONCLUSION

For the reasons set forth above, the Coke Oven Communities respectfully ask that the Court grant their motion and vacate EPA's unlawful Interim Rule, or alternatively, stay the Interim Rule pending judicial review.

Dated: August 11, 2025                    Respectfully submitted,

*/s/ Tosh Sagar*
Tosh Sagar
Adrienne Y. Lee
Kevin Breiner

23

Earthjustice
1001 G Street, NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
tsagar@earthjustice.org
alee@earthjustice.org
kbreiner@earthjustice.org

*Counsel for GASP, Hoosier
Environmental Council, Just Transition
Northwest Indiana, PennFuture, and
Sierra Club*

*/s/ David Bookbinder*
David Bookbinder
Director of Law and Policy
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, D.C. 20006
(202) 469-3151
dbookbinder@environmentalintegrity.org

Haley Lewis
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, D.C. 20006
(202) 263-4449
hlewis@environmentalintegrity.org

*Counsel for Clean Air Council and
PANIC*

24

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), counsel hereby certifies that the foregoing Motion of Clean Air Council, GASP, Hoosier Environmental Council, Just Transition Northwest Indiana, PANIC, PennFuture, and Sierra Club for Summary Disposition and Vacatur contains 5,132 words, as counted by counsel's word processing system, and thus complies with the 5,200-word limit. *See* Fed. R. App. P. 27(d)(2)(A).

Further, this document complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure, 32(a)(5) and (a)(6), because this document has been prepared in a proportionally spaced typeface using **Microsoft Word for Microsoft 365** using **size 14 Times New Roman** font.

Dated: August 11, 2025

*/s/ Tosh Sagar*
Tosh Sagar

25

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 18 AND CIRCUIT RULE 18

Pursuant to Federal Rule of Appellate Procedure 18 and D.C. Circuit Rule 18, Movants Clean Air Council, GASP, Hoosier Environmental Council, Just Transition Northwest Indiana, PANIC, PennFuture, and Sierra Club certify that on August 7, 2025, they submitted to EPA a Petition for a Stay of the final action taken at 90 Fed. Reg. 29,997 (July 8, 2025), entitled "National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review." As of this filing, EPA has not acknowledged receipt of the Petition or otherwise responded.

Dated: August 11, 2025

*/s/ Tosh Sagar*
Tosh Sagar

26

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure and D.C. Circuit Rule 26.1, Movants Clean Air Council, GASP, Hoosier Environmental Council, Just Transition Northwest Indiana, PANIC, PennFuture, and Sierra Club state that they are non-profit environmental organizations without any parent corporation or stock.

Dated: August 11, 2025

*/s/ Tosh Sagar*
Tosh Sagar

27

## CERTIFICATE OF PARTIES

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1)(A), I certify that the parties to this case are set forth below.

<u>Petitioners</u>: Petitioners in this case are Clean Air Council, GASP, Hoosier Environmental Council, Just Transition Northwest Indiana, PANIC, PennFuture, and Sierra Club

<u>Respondents</u>: Respondents in this case are the United States Environmental Protection Agency ("EPA") and Lee Zeldin, in his official capacity as Administrator of the EPA.

<u>Intervenors</u>: None at present.

<u>Amici Curiae</u>: None at present.

Dated: August 11, 2025

*/s/ Tosh Sagar*
Tosh Sagar

28

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of August, 2025, I filed the foregoing motion on Respondents with the Court's CMS/ECF system, which will notify each party.

Dated: August 11, 2025

*/s/ Tosh Sagar*
Tosh Sagar

29